THEODORE M. THIELEN et al., Appellants, v. BOARD OF SUPERVISORS OF WRIGHT COUNTY et al., Appellees.

DRAINS: Assessments of Benefits—Comparison of Benefits—Elements of Comparison. In determining whether a given tract of land has been charged with an excessive portion of the total cost of a drain, the comparison of benefits received by the tract in question with the benefits received by other tracts (the assessments on which are admittedly non-excessive) necessitates a careful consideration and weighing of the following:

1. The relative productiveness of the lands before and after the drain is constructed.

2. The relative drainage enjoyed by the lands before the drain is constructed, the nature thereof, whether artificial or natural, and the extent, permanency and adequacy thereof.

3. The relative outlet advantages afforded by the drain,—that is, whether the drain gives an *immediate* outlet for drainage to one tract and only an *opportunity* for such outlet to another tract, and, if the latter, the distance such drainage must be carried in order to reach such outlet, and whether such drainage must be carried through the lands of others.

PRINCIPLE APPLIED: A tile drain was 4½ miles long, had adequate fall, cost $34,900, and the district embraced 2,531 acres.

THE STANDARD 40's.

A 40-acre tract (near the head of the drain), which was taken as a standard and classified at 100 per cent, was composed of 34

acres "swamp" and 5 acres "wet." Prior to construction of the drain, it had no outlet, and was wholly untillable. The drain traversed this 40 diagonally from southeast to northwest at a depth of 8 feet. The assessment was $804.

The two 40's to the north, in the same section, and at the head of the drain, consisted of practically the same kind of land as the standard 40, and were classified at 98 and 93 per cent, and assessed at $788 and $728. These three 40's embraced, in part, an 80-acre pond.

Another 40, which touched the standard 40 at its southeast corner and through which the drain extended, was low, wet and swampy, except 5 acres of high land, and was classified at 90 per cent, and assessed $705. These assessments were admittedly not excessive. The drain followed on to the southeast through boggy but less swampy land, with decrease in classification and assessment.

### THE COMPARED LANDS.

The two Miller 40's, some 80 rods east of the two north 40's named above, each had 2 or 3 small ponds thereon, but were not overflowed from other lands. Both were tiled, part to the east and part to the west, and both were under cultivation prior to the construction of the drain. This tiling emptied into a highway about 120 feet from the public drain in question, had a fall of 4 feet, and could be extended this distance of 120 feet. through the lands of another person. These two 40's were classified at 55 and 50 per cent, and assessed $391 and $362. *Held*, the comparison revealed an inequitable assessment, and that both Miller 40's should be reduced *one half*.

DRAINS: Assessment of Benefits—Inequitable Adjustment of Burdens. The tendency to saddle an unjust portion of the expense of redeeming wet and swampy lands, by drainage, on the dominant estate, which is less benefited, if benefited at all, is condemned.

DRAINS: Assessment of Benefits—Appeal—Burden of Proof as to Inequitableness. Assessments of benefits will not be interfered with by the appellate court *except on convincing proof of their inequitableness*, and, even in view of such proof, the court will proceed with caution, lest, in correcting, the error be reversed.

DRAINS: Assessment of Benefits—Comparison of Benefits—Equitableness—Evidence. Assessments reviewed, and in part approved as approximately just, and in part rejected as inequitable.

*Appeal from Wright District Court.*—CHAS. E. ALBROOK, Judge.

MONDAY, JANUARY 22, 1917.

APPEALS from the orders of the board of supervisors were taken to the district court. These appeals were consolidated, and on hearing, the assessments on all but two 40-acre tracts were approved, and these reduced. The several landowners appeal.—*Modified and remanded.*

*Sylvester Flynn* and *Birdsall & Birdsall,* for appellants.

*Peterson, McGrath & Archerd,* for appellees.

1. DRAINS: assessment of benefits: comparison of benefits: elements of comparison.

LADD, J.—I. Drainage District No. 74 of Wright County was established in 1913. It is about 4½ miles long, less than 1½ miles across at the widest part, and contains 2,531 acres. The drain is of tile, ranging from 16 to 30 inches in diameter, and is 23,160 feet long. The outlet is into White Fox Creek, and tile is laid from there northwesterly through the N½ SW¼ and SW¼ NW¼ of Section 23, the N½ of Section 22, the W½ SW¼ Section 15, the N½ of Section 16, SW¼ SW¼ Section 9, the SE¼ SE¼ of Section 8, and northerly through the E½ NE¼ of Section 8 to the north side of the highway along the section line. The total assessment was $34,900, and to the report of the commissioners first appointed, whose engineer was Bates, to inspect and classify the lands and apportion the costs, expenses, costs of construction, fees and damages assessed, the appellants interposed objections to the assessments recommended therein against their lands as excessive, inequitable and unjust and in excess of benefits conferred by the improvement. No direct benefit was received save to the land of Streever, for the drain did not pass through the land of any other appellant, nor near enough thereto to drain the same except

through laterals. The sole benefit derived therefrom was in being afforded better outlets than previously enjoyed. Of course, the establishment of the district determined that each of these tracts, in so far as included therein, was benefited by the improvement; and, as the total cost is to be apportioned according to benefits, our task is, by comparing the benefits to be conferred on the several tracts, to ascertain whether the assessments levied against the lands of appellants are higher than they should be when compared with those levied against other lands of the district.

The design in excavating drains, open or closed, is first to furnish an outlet available and sufficient for use in draining all the lands of the district. The owners of some of the lands may not connect therewith or tile their lands. The improvement affords them the opportunity so to do, however, and, as drainage will be beneficial thereto, the making of the improvement and the levy of apportioned assessments proceed upon the theory that all will avail themselves of the opportunity for efficient drainage. This is doubtless what Luick, one of the commissioners first appointed, meant when he said, "All the land is supposed to be tiled." Only by so doing do all reap the benefits to be derived from the improvement. Whether tiling has been laid prior to the improvement or this has been done subsequently can make no difference, unless the improvement directly drains the land previously tiled. And even then this ordinarily is not of much importance, for the public drain is then substituted as the outlet, and, where the land intersected thereby has not been drained, laterals, if constructed, necessarily connect with the public drain, taking the water thereto from the same area which would otherwise be cared for by it. The advantage in the way of drainage from having the improvement through any tract of land is likely to be overestimated rather than overlooked.

Proximity thereto, however, always is an important consideration—that is, the distance from each tract of land by the course tiling must be laid to connect with the public drain—as is also the circumstance that the lateral must extend through the land of another. A system which would furnish the most available outlet at the line of each owner's land would go far toward equalizing benefits throughout the district as established, and doubtless such a system would be more frequently recommended by engineers but for the design of keeping down the apparent probable expense of the enterprise in order not to deter those interested from the undertaking.

None of the lands on which assessments are said to be excessive touch the improvement, and in every case connection therewith must be made through land of another. The important consideration, then, is the benefit of the outlet, such as is furnished thereby, as compared with that previously enjoyed for each particular tract. This is all that is meant by the statement in several cases that the fact that the land previously has been tiled when the district was established should be taken into consideration; for, if tiled, there must have been an outlet, and, if permanent and entirely efficient, no benefit could well be derived from a public drain unless it should be from the drainage of lands dominant thereto by carrying off the surface waters which otherwise would reach the servient estate. If, however, the outlet is not permanent, or is not as efficient as the public drain will be when completed, the land necessarily will be benefited. See *Obe v. Board of Supervisors,* 169 Iowa 449; *Harriman v. Board of Supervisors,* 169 Iowa 324; *Rystad v. Drainage District,* 157 Iowa 85; *Lyon v. Board of Supervisors,* 155 Iowa 367.

As the benefits derived by appellants' lands must be compared with those to other tracts in the districts and the several assessments levied, these latter may here be referred

to. The commissioners selected the NE¼ SE¼ of Section 8 as the tract most benefited, found 34 acres of it swamp and 5 acres wet, and classified it at 100 per cent. None of it was tillable. There was no available outlet for it prior to the construction of the public drain. It extended diagonally across from the southeast in a northwesterly direction at an average depth of about 8 feet. This 40 was assessed $804.19. The drain extended through the E½ NE¼ of Section 8, which was about the same kind of land, the upper 40 acres being classified at 93 per cent, and assessed $728.72, and the lower 40 acres classified at 98 per cent, and assessed $799.11. The SW¼ SW¼ of Section 9 was low, wet and swampy, except 5 acres marked high, with drain extending through it, and was classified at 90 per cent, and assessed $705.22. The lands south of Section 8 appear not to have been as swampy, but somewhat of a slough with bogs, and as the drain, following the lowest land, extended to the southeast, percentages and assessments decreased on the different tracts through which it passed. Upon the filing of objections, the board of supervisors appointed a second commission, composed of Meacham, an engineer of long experience, who had made the permanent survey for the improvement and had supervised its construction, and two other eligible persons. They selected the same initial 40 acres, classifying it at 100 per cent, but recommended that the assessment against it be $1,950, and their report recommended that the lower lands through which the improvement extended be classified and assessed higher, and those at a distance from the improvement lower, than did the report of the commissioners first appointed, whose report was adopted.

Reverting, now, to the several appeals, we may first consider—

## II. Miller's Appeal.

The following are the descriptions of his land, the first

column of figures being the assessments as recommended by the commissioners first appointed, and levied by the board of supervisors, and the second column being those recommended by the second commission:

| | | |
|---|---|---|
| NE¼ NW¼ Sec. 9, 32 acres..........$362.92 | $128.70 |
| SE¼ NW¼ Sec. 9, 38 acres.......... 391.79 | 78.00 |
| SW¼ NE¼ Sec. 9, 7 acres.......... 50.52 | |
| Total ...........................$805.23 | $206.70 |
| NE¼ NW¼ Sec. 15, 27 acres..........$306.21 | $ 39.00 |
| NW¼ NW¼ Sec. 15, 35 acres.......... 469.11 | 142.35 |
| SW¼ NW¼ Sec. 15, 39 acres.......... 603.15 | 317.85 |
| SE¼ NW¼ Sec. 15, 40 acres.......... 536.13 | 327.60 |
| Total ........................$1,914.60 | $826.80 |

On hearing in the district court, the assessment against the SW¼ NW¼ of Section 15 was reduced from $603.15 to $553.15, and that against the SE¼ NW¼, from $536.13 to $486.13. According to Meacham, the northeast 40 of the NW¼ of Section 9 had a small pond or two, where the crops had died out. In the southeast 40 there were two little wet spots, one a pond 5 or 6 rods across, near the southwest corner. Both 40's are tiled and cultivated through an outlet extending westerly through the W½ NW¼ of Section 9 to the highway on which it emptied. The fall was nearly 4 feet. The main advantage of the public drain is that of being able, through negotiation or condemnation, to extend this tile through the land of Lewis about 120 feet, so as to connect with the public drain. Meacham estimated the benefits to the northeast 40 at $128.70, and to the southeast 40 at $78, and that the SW¼ NE¼ of Section 9 would not be benefited at all.

Meacham's testimony is to be criticized in two respects: i. e., he omitted to consider benefits to portions of land in-

cluded in the district, and overestimated, as we think, the advantage of drainage by the public drain from land through which it passed.    Miller testified that the E½ NW¼ of Section 9 was thoroughly tiled, part toward the east and the remainder toward the west; that it was not overflowed from other tracts; that he had acquired an outlet to the west into the highway, as stated, and that the benefit to his land from the improvement would not exceed $1 per acre.    Bates was the engineer appointed on the commission first named, and he testified that 28 acres of high and 4 acres of low land were found in the northeast 40, and 28 acres of high and 10 acres of low land in the southeast 40, and that the only advantage of the improvement was a more adequate and accessible outlet.

The public drain is available upon extension of the tiling previously emptying into the highway, and the water, instead of settling in the swampy land or pond beyond, will be carried off to the creek below.    Of course, a permanent outlet 7 or 8 feet deep is greatly to be preferred to that on the surface, other things being equal, and especially to one casting water where it necessarily settles on the land of others and is not likely to remain any considerable time as it is.    It is difficult, however, to estimate its value in dollars, and we shall not undertake to do so, save by comparing the benefits therefrom with those to other lands.    As said, both commissions agreed on the NE¼ SE¼ of Section 8 as the 40 most benefited, and it was classified at 100 per cent.    34 acres thereof were designated swampy, and the remaining 5 acres found to be wet.    Water usually stood in an 80-acre pond on the E½ of this section, and all witnesses agree that this 40 was practically useless without drainage.    No other outlet than the public drain was or had been available.    Said drain extended across it diagonally northwesterly, so that no loss because of distance would be suffered in connecting laterals therewith.    And yet Miller's

north 40 acres are estimated at 55 per cent, the south 40 at 50 per cent, and that in the northeast quarter of the section at 35 per cent, as compared with those to this land, estimated at 100 per cent. The only evidence that the SW¼ NE¼ of Section 8 will be benefited is the circumstance that a portion of it was included within the district. We are not ready to approve of such a comparison. The initial 40 is shown to have been practically unproductive, while all of Miller's 40's were under cultivation.

2. DRAINS: assessment of benefits: inequitable adjustment of burdens.

Though the report of the second commission seems to have been based somewhat on an overestimate of the direct benefits from drainage by the improvement, and the omission of some land included in the district, it has the merit of not ignoring, even in part, the relative advantages nature has given dominant over servient estates in the matter of drainage. A decided tendency is manifested, in the classification and levy of assessments adopted, to minimize the very great benefits to be derived from the improvement by lands wholly or in large part swampy, or subject to excessive overflows, without outlet, and practically unproductive, and to saddle an excessive proportion of the expense on the lands farther away, to which nature has afforded, because of higher elevation, natural drainage, the utilization of which has rendered such lands highly productive. That the initial 40 and those near to or through which the drain passes were assessed proportionately much too low, this record establishes beyond all doubt, and it quite as conclusively appears that Miller's land in Section 9 is classified and assessed proportionately much too high.

3. DRAINS: assessment of benefits: appeal: burden of proof as to inequitableness.

The difficulty of even approximating accuracy in the estimation or comparison of benefits is fully recognized, and we are not inclined, save on convincing proof, to interfere with those made with the advan-

tage of having inspected the land, and even then, in view of not being in a situation to equalize generally, we are inclined to proceed cautiously, lest, in correcting, the error be reversed. We entertain no doubt that, as compared with the initial 40 and others along the improvement, the classification and assessment of these 40's are double what they should be, and accordingly those of each will be reduced one half.

III. Miller also owns the NW¼ of

4. DRAINS: assessment of benefits: comparison of benefits: equitableness: evidence.

Section 15. Meacham testified that the northwest 40 slopes to the south, with the exception of 15 or 18 acres in the northeast corner, which slopes northeast. All of it is in cultivation. The northeast 40 is rolling land, with 27 acres included in the district, sloping to the south. There was a creek along the south line, where an acre or two is low. The southeast 40 also is rolling, and slopes to the south. Before the drain was constructed, it was tiled near the south line. The southwest 40 is practically of the same character. None of the land in this quarter section is subject to overflow, and the outlet therefor, before the construction of the improvement, was south to an open ditch in the land below. There was no outlet for land in the southwest corner, but it is near the public drain which extends across the northeast corner of the NE¼ SE¼ of Section 16, and the southeast 40 is such that we are not inclined to interfere with the finding of the district court. The classification of the northwest 40 at 65 per cent, and the northeast 40 at 55 per cent, appears to be too high, and each is reduced to 50 per cent, and the assessments are reduced accordingly.

IV. Thielen's Appeal.

Mr. and Mrs. Thielen own the SE¼ of Section 15, and the several 40's were assessed as shown in the first column,

and the figures of the second commission appear in the second column:

NE¼ of SE¼ of Sec. 15............$402.10      $245.70
NW¼ of SE¼ of Sec. 15............ 371.17       179.40
SW¼ of SE¼ of Sec. 15............ 482.52       214.50
SE¼ of SE¼ of Sec. 15............ 391.79       140.40

                                 $1,647.58     $780.00

The NW¼ of the quarter was classified at 45 per cent, the NE¼ and the SE¼ at 50 per cent each, and the SW¼ at 60 per cent. Much of this land was unfit for cultivation, only 90 acres having been cultivated prior to the laying of a tile system in 1911. The main extended from a ditch near the center of the south line of the quarter northwesterly 2,050 feet, consisting of 1,000 14-inch tile and the remainder 12- and 10-inch tile. The ditch extends into the land below. Another outlet was into a ditch near the center of the east line. The main there was of 6-inch tile. Laterals were laid 100 feet apart, and the result was the efficient drainage of 140 acres, leaving 20 acres unfit for cultivation. This 20 acres had been seeded to tame grass. The outlets, it is to be observed, were not permanent, nor such as ordinarily prove entirely satisfactory, though the fall, being 2.78 feet, was enough to carry off the water. The public drain was more than 80 rods from any part of this quarter, and from the south line where the 14-inch main ends, the distance, as we understand the record, is one-half mile. As compared with the benefits derived by the initial 40 and others along the improvement, we think the classification should not have exceeded 40 per cent on each of these 40's, and it and the assessments will be reduced accordingly.

V. Streever's Appeal.

George Streever owns the E½ of Section 16. The public drain extends across the SW¼ SW¼ of Section 15 to

near the west line of the section near the northwest corner
of this 40, then north about 80 rods, then northwesterly
across the northeast corner of the SE¼ of Section 16,
and diagonally through the southeast 40 of the NE¼,
touching the northeast 40 and on through the northwest 40
of the NE¼ of the section. The assessment and estimates
of the first and second commissions were as stated below:

| Description | Bates | Meacham |
|---|---|---|
| NE¼ NE¼ Sec. 16.................\$587.68 | | \$429.00 |
| NW¼ NE¼ Sec. 16................. 643.35 | | 727.35 |
| SW¼ NE¼ Sec. 16................. 562.94 | | 544.05 |
| SE¼ NE¼ Sec. 16................. 643.35 | | 719.55 |
| NE¼ SE¼ Sec. 16................. 562.94 | | 891.15 |
| NW¼ SE¼ Sec. 16................. 383.54 | | 78.00 |
| SW¼ SE¼ Sec. 16................. 157.74 | | 27.30 |
| SE¼ SE¼ Sec. 16................. 532.83 | | 403.65 |
| | \$4,074.37 | \$3,820.05 |

It is to be observed that the commissioners headed by
Bates and those headed by Meacham differed but little in
their estimates in the aggregate, though they proceeded on
different theories. Meacham testified that the NE¼ NW¼
of Section 16 was a wide, wet slough, with a pond over
a great portion of it, and Streever, that there were about
20 acres of slough which would be covered with water before
it overflowed, and that some water stood on the land about
11 months of the year. This water, as we understand the
record, passed through the depression in Streever's land.
Prior to the making of the improvement, he had extended
a 12-inch tile drain from a ditch in the highway between
Sections 15 and 16, and near the half section corner, in a
northwesterly direction about 100 rods, and had laid 4
branch tile drains therefrom. This followed the depression
and was approximately in the location near where the
public drain was subsequently laid.

Streever testified that all of his land was cultivated or in pasture, and that the land in pasture could be cultivated, and there were no ponds or standing water on it, though there was a' depression where the public drain was placed. He estimated that not more than 8' or 9 acres were subject to overflow and that the benefits to his land would not exceed $5 per acre. Smith, an engineer who assisted one Gibbs in taking elevations in different parts of Streever's farm, testified that the point where the tile enters Streever's land from the southeast is 7 feet lower than where it leaves it at the north; that the land along the course of the improvement was subject to overflow; and that farther back it did not overflow. He estimated that about 5 acres in the NE¼ NE¼ overflowed, and about the same area in the NW¼ NE¼; that there were 5 acres in the NE¼ SE¼ that overflowed, and 3 acres in the SW¼ NE¼, and about the same area in the SE¼ SE¼; but that the W½ SE¼ had no overflow. The evidence leaves no doubt that every 40 of this land was benefited by this improvement. The drain touches or passes through four 40's. It is but a few feet from the SW¼ NE¼, and across the road from the SE¼ SE¼.

Owing to the location of the drain with reference to these lands and their character, we are not inclined to interfere with the assessments apportioned to them. But the SW¼ SE¼ and the NW¼ SE¼ were not subject to overflow, and the elevations taken show that the fall was such as to have carried the water from them in large part independently of artificial drainage. The percentage of the NW¼ SE¼ will be reduced from 60 to 40 per cent, that of the SW¼ SE¼ from 45 per cent to 25 per cent, and the assessments accordingly. As indicated at the outset, the situation is such as to render it all but impossible to attain any very satisfactory result. This is because the assessments against the initial 40 and others of like character

and similar situation, are inadequate, according to benefits, and proportionately much too low. The consequence is that much of the burden of furnishing an outlet and drainage to them is borne by other lands. The evidence leaves no doubt that the report of the commissioners last appointed approximated much nearer a relatively accurate apportionment than that adopted by the board.

The tendency to saddle an unjust portion of the expense of redeeming wet and swampy lands by drainage on the dominating estates, less benefited, if at all, is to be condemned, and the classification and apportionment should be made strictly in accordance with the benefits reasonably to be expected or actually enjoyed. The cause is remanded to the district court for the modification of the decree in harmony with this opinion.—*Modified and remanded.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.